IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 6:21-CR-1 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| JERMEL LAWRENCE STOREY | ) | |
| also known as "Jah" | ) | |
| | ) | |

**<u>UNITED STATES' PROFFER OF FACTS IN SUPPORT OF GUILTY PLEA</u>**

This proffer of facts summarizes the facts and circumstances surrounding the criminal conduct of the defendant JERMEL LAWRENCE STOREY, that is at issue in this case. Had this case proceeded to trial, the United States would have proven these facts beyond a reasonable doubt. This proffer of facts does not necessarily contain all of the information obtained during this investigation and applicable to an accurate Presentence Report and Sentencing Guidelines calculation.

1.      JERMEL LAWRENCE STOREY ("STOREY") oversaw a drug trafficking organization that imported cocaine from Houston, Texas and other areas into Charlotte, NC, and then was redistributed to dealers in Lynchburg, Virginia and elsewhere.

2.      Between January 2016 and January 26, 2021, STOREY supplied multiple individuals with kilogram quantities of cocaine for re-distribution. The amount involved in the conspiracy attributable to STOREY as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, was five kilograms or more of cocaine, a Schedule II

1

controlled substance.

3.      Over the course of a multi-year investigation, the Lynchburg Police Department, ("LPD"), Drug Enforcement Administration ("DEA"), and Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") uncovered evidence of STOREY's organization. This included the identification of eyewitnesses to STOREY's conduct, obtaining phone evidence of STOREY involved in the distribution of cocaine, purchasing cocaine directly from STOREY while recording the transaction, conducting surveillance of STOREY's activities, and executing search warrants at locations involved in STOREY's organization. The following summarizes that investigation and the proof the government would proven beyond a reasonable doubt had this matter gone to trial.

### Sub-distributors in Lynchburg, Virginia

4.      STOREY maintained a network of sub-distributors for cocaine in Lynchburg, Virginia. STOREY directed deliveries of cocaine to Lynchburg, invited distributors in Lynchburg to meet him in Charlotte, NC, directed couriers to collect proceeds of drug transactions in Lynchburg, and personally distributed narcotics in Lynchburg.

*Co-conspirator #1*

5.      Co-conspirator #1 was a Lynchburg-based cocaine distributor supplied by STOREY. Between 2016 and 2020, Co-conspirator #1 obtained more than 65 kilograms of cocaine from STOREY.

6.      STOREY would "front" Co-conspirator #1 with cocaine, meaning that STOREY would provide the cocaine with the expectation of payment at a later time. Co-conspirator #1

began by receiving one kilogram of cocaine from STOREY per delivery. Over the course of dealing with STOREY, Co-conspirator #1 escalated to receiving five kilograms of cocaine per delivery.

7.     On some occasions, Co-conspirator #1 would travel to Charlotte, NC to acquire cocaine from STOREY. On other occasions, STOREY would send couriers to deliver cocaine. The couriers often drove a gray Honda Pilot SUV that had a hidden storage compartment where the cocaine was concealed during transport. The couriers would also collect currency that was payment for fronted cocaine to deliver to STOREY.

8.     STOREY often communicated using Facetime video calls. On several occasions, STOREY displayed a firearm later identified by Co-conspirator #1 as the Aero-Precision Rifle Model X15 subsequently discovered by law enforcement in STOREY's home.

*Co-Conspirator #2*

9.     Co-conspirator #2 was a Lynchburg-based cocaine distributor who was supplied, in part, by STOREY.

10.     Co-conspirator #2 was released from prison in 2016 and contacted STOREY, whom he had a prior relationship. STOREY fronted Co-conspirator #2 two ounces of cocaine, which was delivered by a courier. The same courier collected payment approximately two weeks later. Co-conspirator #2 purchased two ounces of cocaine from STOREY in the same manner on second occasion. A different courier delivered the cocaine to Co-conspirator #2 and later collected payment.

11.     In February 2017, STOREY fronted an additional four ounces of cocaine, valued

3

at $4,400, to Co-conspirator #2. Co-conspirator #2 was then arrested for an outstanding probation violation and lost the four ounces of cocaine. Once released, Co-conspirator #2 contacted STOREY who would not sell any additional cocaine to him until he paid the $4,400 debt.

12.     Co-conspirator #2 did not have contact with STOREY again until the middle of 2018. STOREY invited Co-conspirator #2 to come to Charlotte, NC to purchase six ounces of cocaine for $6,000. STOREY and Co-conspirator #2 met at a TGI Friday's in Charlotte, NC and sat at the bar. Co-conspirator #2 gave STOREY the $6,000. STOREY said he would go to his car and obtain the cocaine. STOREY left the area without supplying Co-conspirator #2 with the cocaine. Co-conspirator #2 called Co-conspirator #3 after this occurred and complained about what had happened. Co-conspirator #3 called STOREY who stated that Co-conspirator #2 owed him money and he had left him at TGI Fridays. STOREY later apologized to Co-conspirator #2 for what transpired.

13.     Towards the end of 2018, STOREY called Co-conspirator #2 via Facetime video and showed him he was meeting a Hispanic male source of suppler. STOREY told Co-conspirator #2 he would front 500 grams of cocaine to Co-conspirator #2. A female courier delivered the 500 grams to Co-conspirator #2 in Lynchburg, Virginia on STOREY's behalf. Approximately three weeks later, STOREY visited Co-conspirator #2 to collect $19,800 as payment.

14.     Over the course of the following two to three months, STOREY sent four to five additional shipments of cocaine to Co-conspirator #2 using various couriers. Each shipment was

between 250 grams and 1,000 grams of cocaine.

15.     Co-conspirator #2 was arrested in November 2019. At that time, Co-conspirator #2 owed STOREY between $31,000 and $41,000 for unpaid cocaine.

16.     Co-conspirator #2's phone was obtained upon his arrest and searched by law enforcement, pursuant to a search warrant. Co-conspirator #2 had numerous messages with STOREY between October 2018 and November 2019. In the messages, STOREY sent pictures of three different kilograms of cocaine and discussed their prices. One of the kilograms was stamped or imprinted with the picture of a scorpion. On multiple occasions, STOREY texted Co-conspirator #2 he was sending female couriers to deliver cocaine and gave updates as to their whereabouts.

*Co-conspirator #3*

17.     Co-conspirator #3 was a Lynchburg-based narcotics distributor who was supplied cocaine, in part, by STOREY.

18.     In or about March 2018, Co-conspirator #3 began purchasing cocaine from STOREY. Co-conspirator #3 initially purchased nine ounces of cocaine and two pounds of marijuana from STOREY. During the summer of 2018, for two to three months, Co-conspirator #3 purchased nine ounces of cocaine from STOREY on a weekly basis. Co-conspirator #3 then began purchasing 500 grams of cocaine from STOREY on a weekly basis for six months.

19.     Beginning in the fall of 2018, Co-conspirator #3 began purchasing a kilogram of cocaine from STOREY twice a month until the middle of 2019.

20.     Co-conspirator #3 moved to Charlotte, NC in August 2019 and lived there until

5

November 2019. During this time, Co-conspirator #3 would deliver cocaine on behalf of STOREY to individuals in Lynchburg, Virginia. Co-conspirator #3 also purchased cocaine from STOREY during this time and redistributed it to individuals in Lynchburg, Virginia.

*Co-conspirator #4*

21.     Co-conspirator #4 was a Lynchburg-based cocaine distributor who was supplied, in part, by STOREY.

22.     Co-conspirator #4 had previous dealings with STOREY but reconnected with him in 2015. Co-conspirator #4 contacted STOREY to purchase cocaine and STOREY sent a courier to deliver nine ounces of cocaine and then another 18 ounces of cocaine. STOREY traveled to Lynchburg and collected payment from Co-conspirator #4.

23.     STOREY delivered an additional 14 ounces of cocaine to Co-conspirator #4. Co-conspirator #4 was then incarcerated until October 2019. Upon his release, Co-conspirator #4 contacted Donnell Miller. In Co-conspirator #4's presence, Miller called STOREY to let STOREY know Co-conspirator #4 had been released. STOREY directed Miller to give Co-conspirator #4 $500, which Miller had owed to STOREY for fronted narcotics.

24.     Shortly thereafter, STOREY fronted two pounds of marijuana to Co-conspirator #4. The marijuana was delivered by Co-conspirator #1.

25.     In December 2019, Co-conspirator #4 traveled to Charlotte, NC to meet with STOREY at an Applebees restaurant near Harris Boulevard. STOREY fronted Co-conspirator #4 with nine ounces of cocaine. Co-conspirator #4 paid STOREY for the cocaine at a later date.

26.     In January 2020, Co-conspirator #4 again traveled to Charlotte, NC. Co-

conspirator #4 met STOREY at an apartment complex where STOREY fronted him an additional nine ounces of powder cocaine. Co-conspirator #4 paid STOREY for the cocaine at a later date.

*Donnell Miller*

27.     During the course of the investigation, law enforcement obtained a search warrant for text messages associated with Donnell Miller's phone number for the time period December 13 and 14, 2019. In these texts, Miller communicated with STOREY and set up a meeting at a hotel in Charlotte, NC. Prior to actually meeting, Miller texted STOREY "bruh I'm in 326. Yo I only had enough for 1 -and a ½." This reference was to 1.5 kilograms of cocaine. Shortly thereafter, Miller texted with multiple individuals regarding the sale of gram quantities of cocaine. For example, in one text Miller told one individual "I'll have everything ready for u. came when u ready." One individual asked "need half g slo and 5 of slo. Also do you unhave half g of soft?" Another user texted, "7 g." These terms corresponded with selling cocaine.

*Quentin Horsley*

28.     Quentin Horsley was a Lynchburg-based narcotics distributor who was supplied, in part, by STOREY. Horsley was arrested for drug distribution charges and his phone was searched law enforcement pursuant to a federal search warrant. Horsley's phone contained a conversation with STOREY, using a phone number STOREY also used to communicate with Co-conspirator #2. In November 2018, STOREY directed Horsley to an address in Charlotte, NC. Horsley responded he was on the way. Horsley stated, "yooo u went to the press on me," meaning the Horsley was accusing STOREY of cutting the cocaine and reducing its quality. STOREY responded, "that's how they came n it's fire I just too it to somebody to drop it,"

7

meaning it was good quality cocaine.

29.     Later in November 2018, Horsley stated that he needed a "stamped for 34," referring to a kilogram of cocaine for $34,000. Horsley provided STOREY with an address in Lynchburg, Virginia and told STOREY to "pull up." STOREY stated that it was on its way. Horsley asked if STOREY was sending the "scorpion joints," to which STOREY replied, "yes scorpion." Horsley texted STOREY an address on a third occasion later in November 2018.

*Jason "Chi Chi" Hamlette*

30.     Jason Hamlette, nicknamed "Chi Chi," was a Lynchburg-based cocaine distributor who was supplied, in part, by STOREY. Hamlette had a longstanding relationship with STOREY.

31.     In or about November 2020, STOREY directed Hamlette to come to the residence of James Mason, also known as "Turtle," in Lynchburg, Virginia to purchase cocaine. While at the residence, Hamlette purchased 4.5 ounces of cocaine from STOREY.

32.     On another occasion, Hamlette purchased 9 ounces of cocaine from directly STOREY in a transaction that took place at the Kirkley Hotel in Lynchburg, Virginia.

33.     On another occasion, Hamlette traveled to Charlotte, NC, and met him at an apartment building. Hamlette purchased 4.5 ounces of cocaine from STOREY.

34.     On another occasion, Hamlette traveled to Charlotte, NC and met with STOREY. STOREY gave Hamlette 500 grams of cocaine to deliver to Jonas Ellison in Lynchburg, Virginia. Hamlette replaced 14 grams of 500 grams with baking soda and kept the 14 grams of cocaine for himself.

35.     STOREY instructed Hamlette to collect money owed to STOREY from Corey Johnson and Donnell Miller. Hamlette collected approximately $27,000 from Corey Johnson and $7,000 from Miller and delivered it to STOREY.

*December 6, 2020*

36.     On December 6, 2020, STOREY made arrangements to sell cocaine to multiple individuals in the Lynchburg, Virginia area using co-defendant James Mason's home as a place of distribution. STOREY communicated with co-defendants Jason Hamlette, Jabari Johnson, and others and instructed them to come to Mason's residence for purposes of purchasing narcotics.

37.     Law enforcement observed STOREY travel from Charlotte, NC to Lynchburg, Virginia and arrive at Mason's residence at 5712 Edgewood Ave, Lynchburg Virginia. Shortly after arriving, a courier acting on STOREY's behalf drove a gray Honda Pilot SUV containing a hidden storage compartment and backed it into Mason's driveway.

38.     Over the course of the day, co-defendants Corey Johnson, Jason Hamlette, Adrian Mays, and others arrived at Mason's residence and purchased cocaine from STOREY.

**Distribution of Cocaine in January 2020**

39.     On or about January 27, 2020, STOREY directed Co-conspirator #1 to deliver cocaine to Co-conspirator #4. Co-conspirator #1 traveled to Charlotte, NC and met with STOREY, intending to purchase 500 grams of cocaine. STOREY instead gave Co-conspirator #1 a one kilogram brick of cocaine and told Co-conspirator #1 to take the cocaine to Co-conspirator #4 in Lynchburg, Virginia and split the kilogram between them.

40.     Co-conspirator #1 traveled with the kilogram to a location in Lynchburg where he

met with Co-conspirator #4. Co-conspirator #1 divided the kilogram and weighed it in Co-conspirator #4's presence before giving him 500 grams.

### Trafficking Cocaine from Houston, Texas

41.    During the course of the conspiracy, STOREY developed a source of supply in Houston, Texas named Juan Valdez. STOREY used a courier named Lisa Rangeley who lived in Lynchburg, Virginia, to drive from Charlotte, NC with large quantities of United States currency in a hidden compartment.

*Introduction to Juan Valdez*

42.    STOREY told Valdez that he was obtaining cocaine from Supplier-1. STOREY stated that Supplier-1 was mailing cocaine to STOREY and that STOREY was paying $26,000 to $28,000 per kilogram of cocaine. STOREY stated he was receiving 5 to 10 kilograms per transaction.

43.    In 2018, STOREY asked Valdez if he could obtain cocaine for STOREY. STOREY initially requested two kilograms of cocaine. Valdez found a source of supply for cocaine who lived in Houston, Texas and who he previously knew ("Supplier-2").

44.    STOREY sent Valdez approximately $53,000 in a FedEx package for the purchase of two kilograms of cocaine. Valdez went to Supplier-2 and purchased two kilograms of cocaine. Valdez shipped the cocaine to STOREY in Charlotte, NC.

45.    On a second occasion, STOREY sent Valdez money via FedEx. Valdez again went to Supplier-2 and obtained two kilograms of cocaine. Valdez then sent the cocaine to Storey.

46.     On a third occasion, Valdez received an empty FedEx box from STOREY. Valdez told STOREY, who indicated it should have contained money for an additional two kilograms of cocaine.

*Using Lisa Rangeley as a Courier*

47.     In or about November 2019, a friend of Lisa Rangeley asked Rangeley if she wanted to make money making a "run" for someone. Rangeley said that she did and the friend provided the phone number for STOREY.

48.     STOREY called Rangeley that same day. STOREY told Rangeley that he paid his "drivers" $2,000 per trip. Rangeley asked for $3,000 for the trip. STOREY agreed but said that any additional trips would pay $2,500.

49.     Rangeley traveled from Lynchburg, Virginia to Charlotte, NC to meet with STOREY. Rangeley met STOREY at a hotel in Charlotte. Parked at the hotel was a 2005 gray Honda Pilot SUV. STOREY told Rangeley this was the vehicle she would be driving and it featured a hidden storage compartment. STOREY told Rangeley the hidden compartment already had United States currency inside.

50.     STOREY gave Rangeley $1,500 and advised her he would pay the other $1,500 when she returned. STOREY provided Rangeley with general directions to drive south and said he would follow up with more details.

51.     Rangeley left her personal vehicle at the hotel and began driving the Honda Pilot SUV south from Charlotte, NC. When Rangeley reached an area close to Alabama, she received a call from STOREY. Rangeley told STOREY she thought she was traveling to Florida to

acquire marijuana. STOREY told Rangeley that she would be going to Texas to "pick up something else." STOREY then provided Rangeley with the address 3705 Billingsley Street, Houston, Texas.

52.     Rangeley continued to drive until she reached 3705 Billingsley Street, Houston, Texas. When Rangeley arrived she met with Juan Valdez. Rangeley then used Facetime to conduct a video call with STOREY so that STOREY could see Valdez. Rangeley accessed the hidden storage compartment and removed multiple cloth drawstring bags that contained cash. Rangeley gave the bags to Valdez.

53.     Valdez then led Rangeley to a nearby Sleep Inn Hotel. Rangeley stayed the night. The next day, Rangeley traveled to 3705 Billingsley Street where she met with Valdez. Valdez gave Rangeley a bag containing four to five bricks which were kilograms of cocaine. Rangeley placed the bricks inside the hidden compartment. Rangeley then drove back to Charlotte, NC.

54.     Rangeley met STOREY at a hotel in Charlotte, NC. STOREY drove the Honda Pilot SUV away. Rangeley entered her personal vehicle and found the additional $1,500 in payment in her glove compartment.

*Continued Trips*

55.     Approximately one week later, STOREY contacted Rangeley again and asked her to make another trip to Houston. Rangeley agreed and traveled from Lynchburg, Virginia to Charlotte, NC. STOREY provided Rangeley with the Honda Pilot SUV and Rangeley drove to 3705 Billingsley Street in Houston, Texas. Rangeley met with Valdez again and provided him the cash contained in the hidden compartment of the Honda Pilot SUV. Rangeley stayed the

night in Houston, Texas and met Valdez the next day. Valdez provided Rangeley with four to five "bricks" wrapped in duct tape, which were kilograms of cocaine. Rangeley used the Honda Pilot SUV to drive the cocaine back to STOREY. STOREY took possession of the Honda Pilot SUV and paid Rangeley.

56.     Rangeley continued this pattern of activity once per week or every other week until March 2020 as follows:

a.  Rangeley would drive her vehicle from Lynchburg, Virginia to meet with STOREY in Charlotte, NC;

b.  STOREY would provide Rangeley with the Honda Pilot SUV and Rangeley would begin driving to Houston, Texas;

c.  Rangeley would meet Valdez at the Billingsley Street address and provide him with the cash contained in the hidden compartment of the Honda Pilot;

d.  Rangeley would then spend one night, or more, at various nearby hotels in Houston;

e.  Rangeley would return to the Billingsley Street address and Valdez would provide Rangeley with the cocaine;

f.  Rangeley would then drive the Honda Pilot SUV back to Charlotte, NC and drop off the vehicle with STOREY and Ricky Abner. Abner would drive the Honda Pilot SUV away with the cocaine;

g.  Rangeley would pay her own expenses during the trip, including gas and hotel stays.

13

57.     Rangeley acquired between two and five kilograms of cocaine per trip during this timeframe.

58.     During this time, Rangeley did not have contact with Valdez outside of meeting him at the Billingsley Street address.

59.     Due to the COVID-19 pandemic, Rangeley took a two-month break from her transportation activity. In the summer of 2020, Rangeley resumed this activity.

60.     When Rangeley resumed, STOREY directed her to a different address to meet a different supplier of cocaine. STOREY directed Rangeley to go to 1124 Hammock Street, Houston, Texas. When Rangeley arrived, she met two Hispanic males, a father and son. Rangeley went to this address on approximately five occasions and acquired two to five "book sized" packages, which were each kilograms of cocaine.

61.     STOREY told Rangeley he had a dispute with the supplier on Hammock Street and instructed her to return to the Billingsley Street address and meet with Valdez.

62.     Between the summer of 2020 and January 2021, Rangeley made trips weekly or every other week as outlined above. On each occasion, Rangeley acquired between two and five kilograms of cocaine.

63.     On one occasion, Rangeley was driving the Honda Pilot SUV and had car trouble in Louisiana. Rangeley called STOREY and STOREY assisted her in having the Honda Pilot SUV towed to Ron's Repair Shop in Houston, Texas. While waiting for the Honda Pilot SUV to be repaired, Rangeley stayed at a hotel in Houston and was visited by Valdez and Valdez's wife, who brought Rangeley groceries. The Honda Pilot SUV was ultimately repaired over the course

of approximately one week. Once repaired, Rangeley drove the Honda Pilot SUV back to Charlotte, NC with cocaine provided by Valdez.

64.     After the incident where the Honda Pilot SUV broke down, Rangeley would sometimes have direct contact with Valdez to alert Valdez as to her whereabouts when making a trip. On several occasions, Valdez would tell Rangeley to meet him at locations in Houston that differed from the Billingsley Street address.

65.     During the course of her participation, Rangeley had numerous phone conversations with STOREY and exchanged numerous text messages with STOREY. STOREY often changed phone numbers. Rangeley had one of STOREY's phone numbers saved in her phone as "NONO," which was number a number ending in -0442.

66.     On one occasion, STOREY directed Rangeley to pick up cash from Jason Hamlette in Lynchburg, Virginia and bring it to STOREY in Charlotte, NC.

67.     On one occasion, STOREY directed Rangeley to pick up cash from a "Jerry" in Lynchburg, Virginia and bring it to STOREY in Charlotte, NC.

*Final Trip*

68.     On or about January 24, 2021, Rangeley made her final trip for STOREY. Rangeley drove from Lynchburg, Virginia and met with STOREY at a hotel in Charlotte, NC. Rangeley acquired the Honda Pilot SUV and drove it to Houston, Texas. Rangeley met with Valdez and acquired eight kilograms of cocaine. Rangeley delivered the packages to STOREY in Charlotte, NC. Ricky Abner drove the Honda Pilot SUV away from the parking lot. Rangeley returned to Lynchburg, Virginia.

15

**Kirkley Hotel Transaction**

69.     In or about October 2020, STOREY contacted Hamlette about the availability of cocaine. STOREY was seeking to obtain 2.5 kilograms of cocaine. Hamlette contacted Alonzo McDonald and Anotnio Edwards (also known as "Red"). Hamlette arranged for McDonald and Edwards to sell the cocaine to STOREY at the Kirkley Hotel in Lynchburg, Virginia. Hamlette had another individual rent a room at the hotel so he could use the room for the transaction.

70.     STOREY arrived at the hotel with three other individuals, including co-defendant Ricky Abner. McDonald and Edwards arrived separately. The terms of the transaction were purported to be $107,500 for 2.5 kilograms of cocaine.

71.     STOREY handed a bag containing U.S. currency to Hamlette for him to count. Hamlette took the bag to the hotel room. Hamlette counted and found that the bag contained several thousand more than $107,500. Hamlette kept the amount in excess of $107,500 for himself.

72.     Hamlette returned and handed the bag of money to McDonald and Edwards who provided a bag containing the cocaine to STOREY.

73.     After the meeting, STOREY contacted Hamlette and told him the bag did not contain the promised 2.5 kilograms, but was only 2 kilograms and was not of good quality. STOREY wanted the contact information for McDonald and Hamlette provided it to STOREY. STOREY later had a courier deliver 850 grams of cocaine involved in the transaction at the Kirkley Hotel to Hamlette. Hamlette ultimately owed STOREY approximately $43,000 for what had transpired at the Kirkley Hotel.

16

74.    As described more fully below, law enforcement executed a search warrant at STOREY's residence and recovered his cellular phone. STOREY's phone contained messages with Alonzo McDonald in which he acknowledged being a part of the Kirkley Hotel transaction and then threatened McDonald and Antonio Edwards because of it. Specifically, between October 17, 2020 and October 18, 2020, STOREY and McDonald shared the following exchange:

   a.   STOREY: "I'm just letting u kno I'm zoning down on y'all [expletives] it ain't over y'all may think so"

   b.   STOREY: *[then sent a picture of five individuals, including Alonzo McDonald and Antonio Edwards]*

   c.   STOREY: "I'm need my shit ASAP or I'm sending it out"

   d.   STOREY: "Buckingham ain't that big"

   e.   STOREY: *[then sent a picture containing the Facebook profiles of McDonald and Edwards]*

   f.   STOREY: "That's all I need"

   g.   STOREY: "Y'all got a nice family"

   h.   McDonald: "Bra I can't complain but I don't take threats kindly."

75.    The conversation continued with the following:

   a.   STOREY: "If I catch anyone of y'all pray for god it's over"

   b.   STOREY: "Or kids"

   c.   STOREY: "Or girl"

d. STOREY: "Or family I kno how to bring y'all clowns out"

e. STOREY: "Imma bust somebody head close n watch y'all [expletives] cry like the bitches y'all is"

f. STOREY: "I hope I caught y'all first but if not I'm caught somebody close remember this pussy"

g. STOREY: "Girl, kids mother included pussy [expletive]"

h. STOREY: "30/40 k ain't gonna b worth it for burying somebody"

**Seizure of Cocaine from Donnell Miller in November 2020**

76.    Law enforcement obtained a federal search warrant for the geo-location of STOREY's phone in November 2020. Law enforcement also obtained a federal search warrant for the geo-location of Donnell Miller's phone.

77.    On November 22, 2020, Donnell Miller's geo-location information indicated he was traveling from Lynchburg, Virginia to Charlotte, NC. The geo-location indicated Miller to be at the parking lot of a Harris Teeter in Charlotte, NC. STOREY's geo-location data showed STOREY traveling from his residence to the same parking lot. This parking lot is where law enforcement had previously conducted two controlled purchases of cocaine from STOREY.

78.    Donnell Miller then traveled from Charlotte, NC to Greensboro, NC and then into Virginia in Pittsylvania County. Once MILLER's vehicle entered Pittsylvania County, Virginia, which is located in the Western District of Virginia, the vehicle was lawfully stopped by the Virginia State Police. At the time of the stop, Maggie Smith was the driver and Donnell Miller was in the front passenger seat. During the course of the search of the vehicle, law

enforcement located a plastic grocery bag behind the front passenger seat which contained a vacuum sealed bag with compressed powder inside. Also inside the bag was mailed addressed to MILLER and Smith, at different addresses. The compressed powder was later sent to the Drug Enforcement Administration (DEA) laboratory where it was identified as 502 grams of cocaine. Law enforcement discovered a second similar package in the center console of the vehicle. The substance contained in this package was likewise sent to the DEA laboratory and was identified as 500 grams of cocaine.

79.    Law enforcement also seized phone belonging to Miller. The DEA subsequently obtained a search warrant for the contents of this phone and discovered a conversation between Miller and STOREY in which they discuss each other's location prior to Miller obtaining the above identified substances from STOREY. Immediately after meeting with STOREY, there is a text from Miller to another individual in which Miller stated, he had "some fire ass food." "Fire" is a term to mean "good" and "food" is a term used to mean "narcotics."

## Controlled Purchases of Narcotics from STOREY

80.    In or about August 2020, the DEA developed a confidential informant ("CI-1") who had a longstanding relationship with STOREY.

81.    Prior to acting as a confidential informant, between January 2020 and March 2020, CI-1 had extensive communications with STOREY where CI-1 was ordering cocaine from STOREY.

*October 20, 2020*

82.    CI-1 previously communicated with STOREY and knew he was selling cocaine

for $1,600 per ounce.

83.     On October 20, 2020, DEA conducted a controlled purchase of narcotics from STOREY using CI-1. CI-1 met with the DEA at a location in Lynchburg, Virginia. In the presence of law enforcement, CI-1 called STOREY who used a phone number ending in -0442. CI-1 told STOREY he was coming to Charlotte, NC to meet. STOREY asked CI-1 what he wanted. CI-1 stated, "72," referring to $7,200. STOREY told CI-1 to "come on."

84.     CI-1 met with DEA again outside of Charlotte, NC. CI-1 received a phone call from STOREY who asked where CI-1 was. STOREY sent CI-1 an address to meet, which was "5825 Highland Shoppes Dr.," the location of a Bojangles restaurant.

85.     DEA searched CI-1 and his vehicle for contraband, finding nothing. DEA provided CI-1 with a recording device and $7,200 buy money. DEA was able to listen to the recording device live and monitor CI-1's location using GPS.

86.     At the same, DEA was performing surveillance of STOREY's residence at 8525 Ridgeline Drive, Charlotte, NC. STOREY exited the residence and entered a black Land Rover. STOREY drove the Land Rover to 6000 Elm Cove Lane, Charlotte, NC., the residence of Ricky Abner. STOREY entered 6000 Elm Cove Lane briefly. STOREY then exited and then began looking through a black Ford truck that was parked in the driveway of the residence. STOREY then entered the black Land Rover and departed.

87.     CI-1 departed the meeting location, followed by DEA. CI-1 drove to the parking lot of Bojangles and parked. CI-1 then called STOREY. STOREY told CI-1 to go to the Harris Teeter parking lot next door.

88.     DEA observed the black Land Rover leave 6000 Elm Cove Lane and drive to the Harris Teeter parking lot. STOREY called CI-1 and asked which vehicle he was in. CI-1 provided a description and CI-1 said he could see STOREY's vehicle. STOREY then parked.

89.     CI-1 exited his vehicle and entered the front passenger seat of STOREY's vehicle, the black Land Rover. STOREY gave CI-1 a bag containing a white substance. CI-1 gave STOREY the $7,200. STOREY stated that "Q" had called STOREY and requested 18 ounces of cocaine. STOREY asked if CI-1 would take it to "Q." CI-1 declined. CI-1 exited STOREY's vehicle. CI-1 returned to his vehicle and then immediately to the meeting location. Once there, CI-1 gave DEA the bag containing the substance. The substance was subsequently sent to the DEA Mid-Atlantic Laboratory and determined to be 139.26 grams of cocaine hydrochloride, a Schedule II controlled substance. DEA also searched CI-1 and his vehicle and found no additional contraband or currency.

90.     Following the transaction, STOREY returned to 6000 Elm Cove Lane. An individual driving a Buick parked at the residence and then entered STOREY's vehicle.

*November 12, 2020 (Attempted Purchase)*

91.     On November 12, 2020, CI-1 met with DEA again in Lynchburg, Virginia for the purpose of conducting a controlled purchase of narcotics from STOREY. CI-1 texted STOREY who used a phone number ending in -0442. CI-1 told STOREY he had "72," referring to $7,200 and told STOREY he was coming to Charlotte, NC. STOREY texted CI-1 "Bro my people was 16," referring to $1,600 per ounce of cocaine. STOREY called CI-1 to ask if he had "seen the number," referring to the price. CI-1 said it would be fine if he could get 4.5 ounces of cocaine.

STOREY confirmed that would work. STOREY told CI-1 to go to the same area.

92.     STOREY called CI-1 approximately an hour later. STOREY stated that he just talked to "his man" and the quality of the cocaine was not the same as the previous transaction. STOREY suggested CI-1 wait a few more days. At the time of this call, law enforcement was monitoring the geo-location data for STOREY's phone, which placed him in the area of 6000 Elm Cove Lane. No transaction occurred on this date.

*November 23, 2020*

93.     On November 23, 2020, DEA conducted a controlled purchase of narcotics from STOREY using CI-1. CI-1 met with the DEA at a location in Lynchburg, Virginia. In the presence of law enforcement, CI-1 called STOREY who used a phone number ending in -0442. CI-1 told STOREY he was coming to Charlotte, NC to meet. CI-1 stated that he had "72," referring to $7,200. STOREY stated that the price would be "75," referring to $7,500. CI-1 told STOREY to give him whatever he can for "72."

94.     CI-1 met with DEA again outside of Charlotte, NC. CI-1 made another phone call to STOREY. CI-1 confirmed he was in the area. STOREY stated that he was ready to go. STOREY then texted CI-1 the address "5409 Prosperity Ridge Road."

95.     DEA searched CI-1 and his vehicle for contraband, finding nothing. DEA provided CI-1 with a recording device and with $7,200. DEA was able to listen to the recording device live and monitor CI-1's location using GPS.

96.     CI-1 left the meeting area. CI-1 was contacted by STOREY who instructed CI-1 to travel to the Harris Teeter where the previous transaction had taken place.

97.     At the same, DEA was performing surveillance of STOREY's residence at 8525 Ridgeline Drive, Charlotte, NC. STOREY exited the residence and entered a black Land Rover. STOREY drove the Land Rover the parking lot of the Harris teeter.

98.     CI-1 exited his vehicle and entered the front passenger seat of STOREY's vehicle, the black Land Rover. STOREY gave CI-1 a bag containing a white substance. CI-1 gave STOREY the $7,200. CI-1 told STOREY he had heard that Donnell Miller and Maggie Smith had just been arrested in Texas. STOREY told CI-1 that Miller was not in Texas. CI-1 left STOREY's vehicle and returned to his own vehicle.

99.     CI-1 began driving back to the meeting location when he received a call from STOREY. STOREY told CI-1 he had just talked to Miller "yesterday."

100.    CI-1 returned to the meeting location. Once there, CI-1 gave DEA the bag containing the substance. The substance was subsequently sent to the DEA Mid-Atlantic Laboratory and determined to be 142.30 grams of cocaine hydrochloride, a Schedule II controlled substance. DEA also searched CI-1 and his vehicle and found no additional contraband or currency.

**Search Warrant at 6000 Elm Cove Lane**

101.    On January 26, 2021, law enforcement executed a federal search warrant at 6000 Elm Cove Lane Charlotte, NC, co-defendant Ricky Abner's residence. 6000 Elm Cove Lane was a "stash house," or location to store drugs and money, used by STOREY as part of the conspiracy.

102.    During the search, law enforcement recovered six firearms. In the kitchen of the

residence, law enforcement located a box of "Cinnamon Toast Crunch" cereal containing a bag of multi-colored pills. On the countertop of the kitchen, law enforcement found a money counter.

103.   Inside a cabinet in the kitchen, law enforcement found the following:

    a.   A bag containing a white powdery substance later determined by the DEA Mid-Atlantic Laboratory to be 5.473 grams of fentanyl;

    b.   A second bag containing a white powdery substance later determined by the DEA Mid-Atlantic Laboratory to be 1.186 grams of cocaine;

    c.   A third bag containing a white powdery substance later determined by the DEA Mid-Atlantic Laboratory to be 0.747 grams of cocaine;

    d.   A plastic container containing a white powdery substance later determined by the DEA Mid-Atlantic Laboratory to be 0.730 grams of cocaine; and

    e.   A set of digital scales.

104.   In the dining room, law enforcement found a black backpack. Inside the backpack was a brick-shaped white powder substance that was later determined by the DEA Mid-Atlantic Laboratory to be 994.7 grams of cocaine. On the dining room table was a Styrofoam cup containing a bag with a white substance that was later determined by the DEA Mid-Atlantic Laboratory to be 2.8 grams of cocaine.

105.   In the garage of the residence, law enforcement located a gray Honda Pilot SUV with North Carolina License Plate HDL-1548 which had been used repeatedly by Lisa Rangeley to meet with Juan Valdez. Inside the vehicle was an after-market hidden storage compartment. Inside the hidden storage compartment were two brick-shaped white powder substances wrapped

in plastic. These were later determined by the DEA Mid-Atlantic Laboratory to contain 1,973.7 grams of cocaine and 6.207 grams of cocaine base.

**Search Warrant at 8525 Ridgeline Drive**

106.     On January 26, 2021, law enforcement executed a federal search warrant at 8525 Ridgeline Drive, Charlotte, NC, STOREY's residence. STOREY was present and taken into custody.

107.     Law enforcement searched STOREY's bedroom. Underneath the bed, law enforcement found an EP Armory AR Style Pistol with high-capacity magazine, a high-capacity drum magazine, a Glock gun box with two magazines, and an Aero-Precision Rifle Model X15 with Serial Number X124076. The Aero-Precision Rifle Model X15 was a short-barreled rifle as defined in 18 U.S.C. § 921(a)(8).

108.     Between the mattress and box spring, law enforcement found two handguns, one on each side of the bed: a Glock .40 caliber Pistol Model 23 with Serial Number BFBE46 and a Metroarms American Classic .45 Caliber Pistol with Serial Number A12-05362.

109.     STOREY knowingly possessed these firearms in furtherance of the drug trafficking conspiracy.

110.     On one of the nightstands in STOREY's bedroom, law enforcement found bundled United States currency, ammunition, and jewelry. On the other nightstand, law enforcement found United States currency, three iPhones, and additional jewelry. In a cabinet, law enforcement found a vacuum sealer. On the floor of the bedroom was a money counter.

111.     In STOREY's bedroom, law enforcement found a handwritten document that was

25

a drug ledger or "owe sheet," listing amounts of money that individuals owed STOREY for cocaine. In total, the document stated that 10 individuals owed STOREY a total of $134,600. This included:

       a.   "Malik" owed STOREY $52,000;

       b.   "Dread" (referring to co-defendant Adrian Mays) owed STOREY $13,500;

       c.   "Chi Chi" (referring to co-defendant Jason Hamlette) owed STOREY $2,000;

       d.   "Jabari" (referring to co-defendant Jabari Johnson) owed STOREY $28,000;

       e.   "Toughie" owed STOREY $18,000;

       f.   "Q" owed STOREY $1,200;

       g.   "Un" owed STOREY $4,000;

       h.   "Kd" owed STOREY $1,800;

       i.   "Ortis" owed STOREY $9,000;

       j.   "Lisa" owed STOREY $4,900.

112.    The ledger further stated "owe Juan $6k" indicating that STOREY owed co-defendant Juan Valdez $6,000 for purchased cocaine.

113.    Throughout the house, law enforcement recovered a total of $53,388.00 in United States currency. Law enforcement further seized multiple items of high-end shoes and jewelry valued at more than $200,000.

**Criminal Record**

114.    At the time of the commission of the offense, STOREY had previously been convicted of a "serious drug offense" specifically, Possession with the Intent to

Manufacture/Distribute Controlled Substances in violation of Virginia Code § 18.2-248, entered on or about May 3, 2010 in the Circuit Court for the City of Lynchburg (CR09021079-00) for which he served more than 12 months imprisonment and for which he was released from serving any term of imprisonment related to that offense within 15 years of the commencement of the instant offense.

115.   The actions taken by STOREY as described above were taken willfully, knowingly, and with the specific intent to violate the law. STOREY did not take those actions by accident, mistake, or with the belief that they did not violate the law.

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
United States Attorney

s/Sean M. Welsh
Sean M. Welsh, VA State Bar No. 89660
Ronald M. Huber, VA State Bar No. 31135
Assistant United States Attorneys

United States Attorney's Office
255 West Main Street, Room 130
Charlottesville, VA 22902
Tel:   434.293.4283
Sean.Welsh@usdoj.gov